### In re PACIFIC SUNWEST PRINTING, a partnership, dba Stanish Printers, Western Sun Graphics, Debtor.

### Bankrupcty No. 79–03164–MZ.

United States Bankruptcy Court, S. D. California.

July 14, 1980.

Stephen A. Rains, El Cajon, Cal., for debtor.

Scott Baker, San Francisco, Cal., for Westguard Leasing.

Philip J. Giacinti, Jr., San Diego, Cal., for trustee.

## MEMORANDUM OPINION REGARDING EQUIPMENT LEASE INTENDED AS SECURITY

JAMES W. MEYERS, Bankrupcty Judge.

### I

This controversy involves the question of whether an equipment lease is a true lease, or merely a disguised secured transaction. The equipment lessor, Westguard Leasing Corporation, formerly SHW Capital Corporation ("Westguard"), has moved this Court under Section 554(b) of the Bankrupcty Code ("Code") for an order directing the trustee, Mr. Ralph O. Boldt, to abandon the leased property to Westguard.[1] The debtor herein, Pacific Sunwest Printing, a partnership which formerly did business as Stanish Printers, is the lessee of the equipment sought to be abandoned. The trustee exercised his right to contest the abandonment, and a hearing was held on the matter before this Court on February 29, 1980.

Having considered the evidence and argument presented by the parties at that hearing, the Court has concluded that Westguard's motion for abandonment should be denied. This opinion is filed to explain that decision.

### II

### FACTS

During the fall of 1976, the debtor desired to acquire some new printing equipment. After having encountered difficulty with several banks in arranging financing, the debtor was referred to SHW Capital Corporation ("SHW").

Representatives of the debtor thereafter engaged in negotiations with SHW which ultimately culminated in the execution of two documents: (i) an "equipment lease" covering a "Solna 224" printer, dated September 20, 1976; and (ii) an "option agreement", dated October 7, 1976.[2]

The lease named the debtor as lessee, and SHW as lessor. The Solna 224 was purchased from San Diego Printing Equipment for $23,000. This figure was comprised of a base price of $20,246, plus transportation and installation charges of $2,754. No federal excise or state sales tax was imposed on the transfer. The lease further obligated the debtor to pay to SHW monthly rentals of $611.93 for a period of 60 months and the debtor also provided SHW with an "advance rental and security deposit" of $3,059.65 covering the first and last four months rental.

Among other things, the lease also provided that the debtor agreed to pay *all* the rent specified above during the initial term of the lease despite loss or damage to the Solna 224 or "for any other reason". Title to the Solna 224 was to remain in SHW and the debtor bore the risk of loss for any loss or damage to it. All taxes and assessments on the machine were to be paid by the debtor, and all licenses and permits required for its use were also to be secured by the debtor.

The lease placed a similar burden on the debtor with respect to the care and maintenance of, and the procurement of insurance on the unit. Under the heading of "Default" the lease provided in part that failure of the debtor to pay any of the rental due under the lease, would allow SHW to accelerate the entire rental obligation owing under the lease. In addition to the acceleration clause, the lease contained a "merger clause" which generally specified that the lease contained the entire and final agreement of the parties.

The option agreement granted the debtor an option to purchase the Solna 224 (upon

---

1. Section 554(b) provides:

    On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value to the estate.

11 U.S.C. § 554(b).

2. SHW "accepted" the lease on October 7, 1976.

performance of the lease obligations) for "$2,300 ... plus applicable taxes, or the Fair Market Value of the Equipment, whichever is greater upon the exercise of this Option Agreement." SHW was granted an option with identical price terms *"to require the lessee to purchase* the ... equipment at the expiration of the lease...."* (emphasis added).

The parties are in dispute as to the agreed upon option price. The debtor contends that one of its partners, Mr. Amedee Breault, was told by a representative of SHW that the portion of the option which specified an option price equal to the fair market value of the equipment was essentially inoperative. Mr. Breault testified that SHW told him that the fair market value aspect of the option would be used by SHW only in the event of an "early purchase" of the Solna 224 by the debtor. Westguard denies this, and objected to the consideration of this testimony by the Court.

All went well between the parties until November 19, 1979. On that date, the debtor filed its Chapter 7 petition with this Court, listing Westguard (as successor to SHW) as an unsecured creditor in the amount of $10,969.10. This development prompted Westguard to file the instant motion for abandonment as "owner and lessor" of the Solna 224.

### III

### DISCUSSION

#### A. *THE EQUIPMENT LEASE AS A SECURED TRANSACTION*

1. *Generally.*

The trustee resists Westguard's motion for abandonment by arguing that the equipment lease was really a lease intended as security and not a true lease. Implicitly then, the trustee argues that under the California Commercial Code ("Commercial

Code") the equipment lease actually amounted to the grant of an unperfected security interest in the Solna 224.[3] If this is the case, then Westguard's claim to the machine would be effectively extinguished as the trustee would have a superior right to the Solna 224. *See* Cal.Com.Code § 9301(1)(b) (West) (*see* discussion, *infra*). This in turn would create "value" in the Solna 224 within the meaning of Section 554, and make abandonment of the device improper.

Westguard takes the position that a true lease was created by their agreements with the debtor. Here, Westguard's contention suggests that the value of the leasehold interest to the estate is inconsequential and burdensome under Section 554, and should therefore be abandoned. In support of its argument Westguard relies on *Triple C. Leasing, Inc. v. All–American Mobile Wash*, 64 Cal.App.3d 244, 134 Cal.Rptr. 328 (1976).

The Court's starting point, however, is the treatment of this issue by the Commercial Code. In particular, Section 1201(37) defines the term "security interest" and discusses the concept of a lease intended as security. It provides:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (Section 2401) is limited in effect to a reservation of a "security interest."... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional considera-

---

**3.** The Uniform Commercial Code was adopted by California in 1963, and became effective as the Commercial Code on January 1, 1965. Cal. Com.Code § 10101 (West). All non–California

authorities cited herein consider provisions of the U.C.C. similar to the California provisions discussed.

tion or for a nominal consideration does make the lease one intended for security. Cal.Com.Code § 1201(37) (West).

■ In construing this section, and its similar versions in other jurisdictions, several guidelines have been developed by courts to aid in determining whether a lease is "one intended as security". Under the "economic realities test", a lease will be held a secured transaction where at the end of the lease term, the only sensible business decision for the lessee would be to purchase the leased goods. *See e. g., In re Washington Processing Co., Inc.*, 3 U.C.C.Rep. 475, 477–78 (S.Cal.1966). Related considerations are outlined in *Triple C. Leasing, Inc.* where it is noted that:

1. The facts in each case control to show intention of the parties to create a security interest.

2. Reservation of title in a lease or option to purchase appurtenant to or included in the lease does not in and of itself make the lease a security agreement.

3. Lease agreement which permits the lessee to become the owner at the end of the term of the lease for a nominal or for no additional consideration is deemed intended as a security agreement as a matter of law.

4. The percentage that option purchase price bears to the list price, especially if it is less than 25% is to be considered as showing the intent of the parties to make a lease as security.

5. Where the terms of the lease and option to purchase are such that the only sensible course for the lessee at the end of the lease term is to exercise the option and become the owner of the goods, the lease was intended to create a security interest.

*Triple C. Leasing, Inc., supra*, 64 Cal.App.3d at pp. 248–49, 134 Cal.Rptr. 328.

■ These criteria have been augmented by other decisions stressing the importance of: (i) whether the lessee must pay charges, taxes and the like imposed on the leased equipment; (ii) whether the lease includes an "acceleration clause" regarding rent payment; (iii) whether the goods in question were purchased specifically for the lessee involved; (iv) whether a sales tax was imposed on the transaction; (v) whether the lessee was obligated to procure and maintain insurance on the leased property; and (vi) whether the lessee was to secure any permits and licenses needed to utilize the equipment. *See All–States Leasing Co. v. Ochs*, 27 U.C.C.Rep. 808, 813 (Or.1979); *In re Joe Necessary & Son, Inc.*, 475 F.Supp. 610, 614 (W.D.Va.1979); *In re Brookside Drug Store, Incorporated*, 3 B.R. 120, 122–23 (Bkrtcy.D.Conn.1980). These cases stress that in a "lease intended as security", the lessor transfers a majority of the benefits and detriments of property ownership to the lessee, and is chiefly concerned with achieving a profitable and secure financing arrangement. *See* R. DeKoven, *Leases of Equipment: Puritan Leasing Company v. August, A Dangerous Decision*, 12 U.San Fran.L.Rev. 257, 260 (1978); *In re Transcontinental Industries*, 3 U.C.C.Rep. 235, 244 (N.Ga.1965).

In order to discern the effect of the lease transaction, however, the Court must consider *all* the relevant facts. To accomplish that, the Court must first address the parol evidence and hearsay issues raised by Westguard.

### 2. The Parol Evidence and Hearsay Questions.

The testimony in dispute relates to certain oral representations made by a representative of SHW to Mr. Breault prior to finalizing the lease. Basically, these representations were that the fair market value portion of the option price would only be operative in the event of an "early purchase" of the Solna 224. This left Mr. Breault with the impression that he could exercise the option for $2,300, or 10% of the equipment's total cost. Westguard objected to the introduction of this testimony on parol evidence and hearsay grounds.

Were the parol evidence in question related to the *lease*, the Court could readily conclude that it should not be admitted.

The lease, as noted earlier, contains a "merger clause" barring the introduction of such evidence, and this type of provision is generally given effect by the courts. *See* White & Summers, *Uniform Commercial Code* § 2–12 (1972).

Here, however, we deal with oral representations relating to the *option agreement* which has no similar merger clause. Despite the Commercial Code's expansive definition of an agreement, *see* Cal.Com.Code § 1201(3) (West), the parties here specified that the lease and option were separate contractual relationships. In this regard the option agreement provides: "This option agreement is a separate and distinct agreement between the parties hereto." Accordingly, the merger clause contained in the lease has no bearing on the parol evidence issue.

To exclude the parol evidence from the Court's consideration, Westguard places reliance on *Weisenburg v. Thomas*, 9 Cal. App.3d 961, 89 Cal.Rptr. 113 (1970). This decision, though, dealt with a contract for the sale of realty and is not pertinent here. The option agreement before the Court is in effect a "transaction in goods" within the meaning of Section 2102 of the Commercial Code, as it extends the debtor a right to purchase certain goods at a future date. *See* Cal.Com.Code § 2102 (West). *See also In re Vaillancourt*, 7 U.C.C.Rep. 748, 770 (D.Me.1970) (purchase options held "contracts to sell goods at a future time" under Maine's version of U.C.C. § 2–106(1)). Therefore, the Commercial Code's parol evidence rule, contained in Section 2202, is applicable here. It provides in essence, that an integrated document may not be contradicted by prior or contemporaneous oral agreements, but can be explained or supplemented by course of dealing, usage of trade, course of performance and consistent additional terms (unless the writing was intended as a complete statement of the parties' agreement). Cal.Com.Code § 2202 (West).

■ Under this formulation, the determination this Court must make is whether the agreement is "intended by the parties as a final expression of their agreement...." *See e. g., S. M. Wilson & Co. v. Smith Intern., Inc.*, 587 F.2d 1363, 1370 (9th Cir. 1978). This is a question of fact to be determined by the Court after reviewing *all* the evidence, extrinsic or otherwise. *See Luria Bros. & Co. v. Pielet Bros. Scrap Iron*, 600 F.2d 103, 109 (7th Cir. 1979); *Peter Pan Seafoods, Inc. v. Olympic Foundry Co.*, 21 U.C.C.Rep. 1231, 1235 (Wash.1977). If the agreement is not integrated, then the parol evidence rule is inoperative. *See Lakeside Bridge & Steel Co. v. Mountain State Construction Co., Inc.*, 400 F.Supp. 273, 277 (E.D.Wis.1975).

■ Here, there is no evidence that Westguard sought to limit the terms of their option agreement as they did with their equipment lease. Nor does it appear that they otherwise stressed its complete and final nature to the debtor's representatives. Factors such as these have been found persuasive by courts in concluding that an agreement was not integrated. *See Michael Schiavone & Sons, Inc. v. Securalloy Co., Inc.*, 7 U.C.C.Rep. 674, 678 (D.Conn. 1970); *Dave Markley Ford, Inc. v. Lair*, 22 U.C.C.Rep. 21, 24 (Okl.1977); *Michigan Bean Co. v. Senn*, 28 U.C.C.Rep. 625, 629 (Mich.1979). Equally relevant is the fact that the Commercial Code assumes that a written contract does *not* express the full agreement of the parties. *See* Cal.Com. Code § 2202 (West) (California Code Comment). *See also S. M. Wilson & Co., supra*, 587 F.2d at p. 1370. Based on these factors, the Court has concluded that the option agreement was not a fully integrated document, and accordingly, the disputed parol evidence can be considered by the Court in assessing the parties' actual agreement.

■ Westguard also objects to the introduction of the evidence because it allegedly violates the hearsay rule. *See* Fed. R.Evid. 802. This objection is not well taken. The representative's statements were not offered to prove their truth, but to show their effect on the state of mind of the listener, Mr. Breault. The testimony tends to show that the parties had agreed that the fair market value clause was inop-

erative. As such, the statements were analogous to a "verbal act" and are excluded from the contours of the hearsay rule. *See* Fed.R.Evid. 801(c). *See also* 4 Weinstein & Berger, *Weinstein's Evidence* ¶ 801(c)[01] (1979); *Creaghe v. Iowa Home Mutual Casualty Co.*, 323 F.2d 981, 984 (10th Cir. 1963).[4]

### 3. The Effect of the Equipment Lease.

■ When the factual background of this case is considered in light of the applicable legal standards, it becomes clear that Westguard's "equipment lease" was a "lease intended as security" within the meaning of Section 1201(37) of the Commercial Code. Under the "economic realities" standard, the prudent business choice presented to the debtor at the end of the lease term would be to purchase the Solna 224. After having paid approximately $37,000 dollars in lease payments (plus the security deposit given) for a machine with a purchase price of $23,000, the debtor would be compelled to exercise the option at only $2,300. As counsel for Westguard estimated at the hearing, the Solna 224 then had a fair market value of approximately $20,000. From this figure, it can reasonably be inferred that the machine would retain its value over the remaining months of the lease and would be worth well in excess of the option price at the exercise of the option.

A similar conclusion obtains when the criteria outlined in *All–States Leasing Co.* and similar decisions are compared with the lease. Although title remained in Westguard under the lease, substantial indicia of ownership were transferred to the debtor. The debtor bore the risk of loss of the machine and was required to pay all taxes and assessments on it as well as secure any license required for its operation. Similarly, the debtor was obligated to insure the property. And lastly, the debtor's obligation to pay *all* rentals on the machine could be accelerated under the lease. These factors persuasively evidence the fact that the debtor had effectively purchased the Solna 224.

Nor is the Court's conclusion at odds with the guidelines set forth in *Triple C. Leasing, Inc.* The option price of $2,300 must be considered clear evidence of the parties' intent to create a secured transaction when that figure is contrasted with the probable range of fair market values the machine would have at the end of the lease term. This aspect of the transaction also points to the conclusion that the option price itself is "nominal" within the meaning of Section 1201(37). *See* White & Summers, *Uniform Commercial Code, supra,* § 22–3 at p. 764.

In summary then, it is clear to the Court that the debtor "had no design other than to obtain the equipment and have someone finance its costs. [Westguard] had no property to lease and had its concern only on supplying and financing at a profitable rate of earning and to be surely secure in its doing." *In re Transcontinental Industries, Inc., supra,* 3 U.C.C.Rep. at p. 244. Being that the lease is one "intended as security", the extent of Westguard's security interest will be determined by Division 9 of the Commercial Code. *See* Cal.Com.Code § 9102(2) (West).

### B. WESTGUARD'S RIGHT TO ABANDONMENT

Insofar as Westguard's security interest is perfected in accordance with Division 9 of the Commercial Code, it renders the "leased" collateral valueless to the debtor. This would in turn justify an abandonment of the goods by the trustee under Section 554(b) of the Code. Thus, the key issue here is one of perfection.

A security interest is perfected under the Commercial Code "when all of the applica-

---

**4.** The testimony could also come in as a vicarious admission. *See* Fed.R.Evid. 801(d)(2)(D). The fact that an SHW representative negotiated the agreements in question is shown by the evidence. Therefore, the negotiations involved at least an implied agency relationship. *See* 1 B. Witkin, *Summary of California Law* "Agency and Employment" § 79 (1973). The disputed declarations, moreover, were made during the course of those negotiations, and concerned a matter within the scope of the agency, i. e. the agreements. *See* 4 Weinstein & Berger, *Weinstein's Evidence* ˙ 801(d)(2)(D) at p. 801–162 (1979).

ble steps required for perfection have been taken." Cal.Com.Code § 9303(1) (West). Section 9302 specifies that (except in certain cases not applicable here) "[a] financing statement must be filed to perfect all security interests...." Cal.Com.Code § 9302(1) (West).

■ Here, Westguard did not perfect its secured status as it failed to file a financing statement. Additionally, Westguard has not filed a timely financing statement as a "lessor" under Section 9408. See Cal.Com. Code § 9408 (West). Accordingly, Westguard's rights are inferior to that of the trustee as the Commercial Code subordinates an unperfected security interest to "lien creditors" arising prior to perfection of the security interest. See Cal.Com.Code § 9301(1)(b) (West). Here, the trustee became such a "lien creditor" the day the debtor filed its petition. See Cal.Com.Code § 9301(3) (West). Owing to this, Westguard assumes the posture of an unsecured creditor with respect to the Solna 224.[5] This conclusion imparts new value to the machine in the hands of the debtor, thus making abandonment improper here.

## IV

## CONCLUSION

In light of the foregoing, Westguard's motion for abandonment is denied. Westguard's security interest under the equipment "lease", moreover, is unperfected, thus reducing Westguard's status to that of an unsecured creditor with a claim in the amount of $10,969.10.

The trustee shall prepare an appropriate order within ten days of the date of this opinion.

---

**5.** The debtor concedes in the schedules filed with its petition that Westguard is an unse-

cured claimant in the amount of $10,969.10.