**In re EUREKA SOUTHERN RAILROAD, INC., Debtor.**

No. I–86–01976, R.S. No. 87–35.

United States Bankruptcy Court, N.D. California.

April 21, 1987.

Philip M. Arnot, Eureka, Cal., for trustee.

Richard W. Bower, Sacramento, Cal., for Dept. of Transp.

John Feeney, Eureka, Cal., for Southern Pacific Transp. Co., Northwestern Pacific R. Co.

David Kelvin, Deputy County Counsel, Ukiah, Cal., for County of Mendocino.

Mary McEachron, Orrick, Herrington & Sutcliffe, San Francisco, Cal., for CIT Group/Equipment Financing, Inc.

Richard Kula, Deputy County Counsel, Eureka, Cal., for County of Humboldt.

Gary A. Laakso, San Francisco, Cal., for Southern Pacific Transp. Co., Northwestern Pacific R. Co.

James T. Quinn, San Francisco, Cal., for the People of the State of Cal. and the Public Utilities Com'n of the State of Cal.

Joseph C. Rusconi, Atty. Gen.'s Office, San Francisco, Cal., for California Coastal Com'n.

## ORDER ON MOTION FOR RELIEF FROM STAY

ALAN JAROSLOVSKY, Bankruptcy Judge.

### BACKGROUND

The specific matter now before the court is the motion of GATX Leasing Corporation ("GATX") for relief from the automatic stay. However, in practical effect a much wider scope of issues and problems is before the court. Not only is this merely the latest in a long series of litigated matters which began in 1983, but the debtor's entire reorganization, and with it the future of rail service to the counties of northwest California, is at stake. Serious issues regarding the rights of lessors, secured creditors and the public are raised which have never before been considered in the context of a railroad reorganization under Subchapter IV of the Bankruptcy Code.

The debtor's history must be fully understood before the present issues can be re-

solved. This is really the history of the Eel River railroad line, which runs for approximately 165 miles from Outlet north to Eureka in Northern California. In 1983 the line's then-owner, Northwestern Pacific Railroad Company, sought ICC authority to abandon the line under 49 U.S.C. section 10903. The ICC refused to authorize the abandonment in early 1984,[1] and Northwestern Pacific thereafter unilaterally discontinued service on the line. The state of California brought suit in federal court, and a district court issued an injunction requiring Northwestern Pacific to repair the line and reopen service.[2]

While its appeal of the ICC ruling denying abandonment was pending, Northwestern Pacific entered into a convoluted sale of the line which created the debtor in these proceedings. The terms of the sale provided that Northwestern Pacific sold the line to a newly formed corporation, Northwestern Pacific Acquiring Corporation ("Acquiring") for $3,323,500 in cash plus a promissory note for $1,622,550. The cash was provided by GATX, which purchased the rails and ties from Acquiring for that amount. GATX then immediately leased the rails and ties to another newly formed corporation, Eureka Southern Railroad Company, the debtor in these proceedings. Eureka Southern at the same time leased the real property of the line from Acquiring. Both leases were for ten years. Both Eureka Southern and Acquiring were formed expressly to consummate the transaction, and both are wholly owned by the same individual. Southern Pacific Transportation Company, the sole owner of Northwestern Pacific, guaranteed GATX's investment.

Both Eureka Southern and Acquiring filed petitions under Subchapter IV of Chapter 11 of the Bankruptcy Code on December 15, 1986. By the present motion GATX seeks to obtain relief from the automatic stay of 11 U.S.C. section 362(a) in order to "repossess" the rails and ties, with the stated intent to rip them from their bed and remove them. The motion is thus a very serious matter for the court to consider, as its decision will determine not only whether the debtor can reorganize but also whether there will be an Eel River line at all.

## LEGAL ISSUES

### 1. Prepetition Termination of Lease

GATX first argues that the lease was terminated before the bankruptcy was filed, and the court must therefore grant the motion as a matter of law. GATX recites without contradiction that in early 1986 it agreed to two successive moratoria on rent due to inability of Eureka Southern to pay. The rent payments were to resume in July, 1986, and when neither the July nor August payments were made GATX gave notice pursuant to the terms of the lease that the lease was terminated and that (also under the terms of the lease) the ties and tracks would be "stored in place" until GATX was ready to remove them. Thereafter, Eureka Southern continued to use the tracks, and has continued to use them to this date.

The first problem the court has with GATX's argument is that it begs the question as to whether this court must consider it to be a *bona fide* lessor in the first place. Simply calling the transaction a "lease" does not make it so; labels cannot change the true nature of the underlying transaction. *In re Woodson Company* (9th Cir. 1987) 813 F.2d 266. *In re Pacific Express, Inc.* (Bkrtcy.E.D.Cal.1985) 55 B.R. 913; *In re Comtek Electronics* (Bkrtcy.S.D.N.Y. 1983) 28 B.R. 829; *Matter of Imperial Heights Apartments, Ltd.* (Bkrtcy.S.D. Ohio 1982) 18 B.R. 858.

It would not take a great deal of insight to determine that where a wholly owned subsidiary of Southern Pacific sells its line to a holding company which immediately

---

1. *Northwestern Pacific Railroad Company—Abandonment—in Mendocino, Trinity and Humboldt Counties, Ca.,* I.C.C. Docket No. AB–14 (Sub-No. 4), slip op., at 45 (Feb. 3, 1984). The full background of the Eel River line is fully discussed in *Railway Labor Executives' Assn. v. I.C.C.* (9th Cir.1986) 784 F.2d 959, 961–63.

2. See *California v. Northwestern Pacific Railroad Co.* (9th Cir.1984) 726 F.2d 505.

sells the rails and ties to GATX, which then leases the rails and ties to the debtor (whose owner also owns the holding company) with a guarantee from Southern Pacific, that in substance the transaction was simply a sale from Southern Pacific to the debtor. Granted, such a holding would require the court to disregard the role of intervening legal entities, whereas in most of the cases cited above only the nature of the transaction between two parties was at issue, without intervening entities. However, if this court as a court of equity is entitled to disregard form and make its determination based upon the substance of a transaction (*Pepper v. Litton* (1939) 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281, it can see no reason why intervening entities with no real interest in the matter cannot also be disregarded. In *Woodson*, supra, the court implicitly did so by finding that supposed "purchases" of fractional interests in notes and deeds of trust from a limited partnership whose sole general partner was the debtor were in fact loans to the debtor. In the case now at issue, only the debtor and Southern Pacific have any true interest at stake;[3] the court is inclined to disregard all else as subterfuge.

It may not even be necessary to examine the involvement of Southern Pacific in order to call into question the true nature of GATX's rights. The lease provides that Eureka Southern must pay all taxes imposed on the leased property, including any property or sales tax; that upon default all future rents are accelerated and immediately due; that Eureka Southern insure the leased property and bear the risk of all losses; that Eureka Southern was to secure any permits and licenses needed to use the leased property; and that Eureka Southern, at the conclusion of the lease, has the option to purchase the leased prop-

erty for a fixed sum. Moreover, GATX specifically obtained the leased equipment for the purpose of leasing it to Eureka Southern, and in fact never actually owned the leased equipment for longer than it took to close a double escrow. Under California law, all of these facts can be indicia that what purports to be a lease is really a security transaction. *In re Pacific Sunwest Printing* (Bkrtcy.S.D.Cal.1980) 6 B.R. 408, 412; *Triple C. Leasing, Inc. v. All-American Mobile Wash* (1976) 64 Cal. App.3d 244, 248–49, 134 Cal.Rptr. 328.

In determining whether a lease is in reality a security transaction, the court must determine the true intent of the parties. Cal.Com.Code sec. 1201(37). In his deposition, the vice president of GATX testified that "we are in the business of asset-based financing, and basically, we seek security." It is not difficult to infer an intent to create a security transaction based on this statement.

The most important factor in determining whether or not a lease is actually a secured transaction is the "economic realities test." Under this test, a secured transaction should be found if the "lessor" transfers a majority of the benefits and detriments of property ownership to the lessee, and is chiefly concerned with achieving a profitable and secure financing arrangement (*In re Pacific Sunwest Printing, supra*, at 412), and if at the end of the lease term the only sensible decision for the lessee would be to purchase the goods. *Id.* A simple reading of the lease between GATX makes it clear that GATX intended to create a secure return on its investment, while transferring all of the detriments associated with the rails to Eureka Southern. Moreover, Eureka Southern would be absolutely compelled to exercise the option to

---

**3.** Northwestern Pacific is wholly owned by Southern Pacific; Acquiring has no separate business, minimal creditors other than Northwestern Pacific, and is wholly owned by the same person who owns the debtor. Its ownership interest in the land under the rails is apparently valueless to its estate, as much of the right-of-way reverts to third parties if not used as a railroad line and the remainder, if any, would be subject to a deed of trust in favor of

Northwestern Pacific securing a $1.7 million note. GATX is guaranteed by Southern Pacific, although it is bound by the terms of the guarantee to do all it can to attempt to enforce its rights against the debtor before it can collect on its guarantee. It is also significant to note that GATX's usual business is the leasing of rolling stock; this is the only instance where GATX has ever leased rails.

purchase, as to do otherwise would be to terminate its business.

■ The court recognizes that the issue of whether the GATX–Eureka Southern lease is actually a secured transaction is not before it, and accordingly makes no finding one way or the other at this time. The court does find, however, that the existence of the issue and the many indicia of a secured transaction make it inequitable and premature to declare the lease irretrievably terminated prior to bankruptcy and to grant relief from the stay now, as urged by GATX.[4]

■ Even if the lease is a true lease, the court does not reach the conclusion urged by GATX that it was irretrievably terminated prior to bankruptcy. No legal proceedings were ever commenced by GATX during the five months between the time it declared a default and the time Eureka Southern filed its Chapter 11 petition, nor did GATX attempt to stop Eureka Southern from continuing to use the line.

GATX correctly notes that the binding law on this issue can be found in *In re Waterkist Corp.* (9th Cir.1985) 775 F.2d 1089, 1092. However, GATX misapplies the holding in that case. In *Waterkist,* as in this case, the lease was terminated by its own terms before the filing of the bankruptcy, but no legal action had been taken to evict the debtor. The Court of Appeals affirmed the decision of the bankruptcy court and the district court denying relief from the automatic stay, holding:

> In this case [the debtor] retained a naked possessory interest in the processing plant at the time the bankruptcy petition was filed. Even though the lease was terminated before the bankruptcy petition was filed, the [lessor] would have to bring an unlawful detainer action to regain possession. The Alaska courts would consider the equities of the situation before allowing the city to enforce the forfeiture of the lease term in the unlawful detainer action....

.... The bankruptcy court correctly determined that [the debtor] could assume the lease as debtor-in-possession.

California laws, like those of Alaska, abhor forfeitures and provide for relief from them (California Civil Code section 3275); GATX acknowledges this. However, GATX reads *Waterkist* as standing for the proposition that unless the trustee convinces the court that in hypothetical state proceedings the debtor would have actually been relieved of the forfeiture, this court *as a matter of law* must grant the relief sought. The court reads *Waterkist* as standing for the proposition that so long as the chance for relief from forfeiture under state law existed at the time of the filing, the debtor's estate has enough interest in the leased property to allow the court to apply normal equitable principles in determining if the automatic stay should be lifted.

■ Lower court rulings are in accord with this court's reading of *Waterkist.* In *In re Acorn Investments* (Bkrtcy.S.D.Cal. 1981) 8 B.R. 506, 509, the court stated the law as follows:

> It is clear that under California law, the mere issuance of a written notice did not put the lease between the parties to an end. The occurrence of a default by the debtor afforded the plaintiff the opportunity, though, to exercise its rights and put its termination *into effect* by recourse to California's unlawful detainer procedures.

See also *In re Escondido West Travelodge* (DC S.D.Ca.1985) 52 B.R. 376, 379, in which the District Court held that a real property lease was not terminated until the landlord filed an unlawful detainer action in state court. While this court disagrees with *Escondido,* and believes that the proper date is the date the tenant can no longer seek relief from forfeiture (in *Escondido* the debtor filed its Chapter 11 petition four hours *after* its motion for relief from forfeiture under Cal. Code of Civ. Proc. sec. 1179 was denied by the state court (52 B.R.

---

4. If the lease is in fact a true lease, it would seem under the reasoning in *Matter of Boston & Maine Corp.,* infra, it is a lease of a railroad line

which must be assumed or rejected pursuant to section 1169 of the Bankruptcy Code. However, the court need not decide this issue now.

at 381 n. 11)), application of the rule in that case does not sustain GATX's position. GATX took no action at all beyond the issuance of notice, even though it had almost five months to do so.

2. Abandonment

The Trustee and the various state and local authorities argue that GATX's motion for relief from the automatic stay is actually a motion to abandon a railroad line under section 1170 of the Bankruptcy Code. This is an important issue, as under that section a railroad line can only be abandoned if abandonment is in the best interests of the estate or essential to a plan and in the public interest. Since *none* of these factors are present, if the motion is treated as one for abandonment it cannot be granted.

GATX responds by arguing that only the Trustee can abandon a line, so that anything a creditor does cannot be deemed an abandonment. It also argues that section 1170 applies only to the line as a whole, not to the tracks and ties which GATX seeks to repossess. It further argues that cessation of business due to circumstances beyond the debtor's control (e.g. repossession of equipment by a third party) does not constitute an abandonment. Under the circumstances of this case, the court does not find merit in these arguments.

■ There is nothing in the wording of section 1170 which requires the motion for abandonment to be brought by the Trustee. To the contrary, the wording of the statute clearly indicates that the court cannot authorize the abandonment of a railroad line if the conditions of section 1170(a) are not met; there is no limitation on how the matter comes before the court or who brings the motion.[5] It may be that under some circumstances application of section 1170 could result in infringement upon a third party's rights, but this issue would

only arise if the creditor could not be afforded adequate protection. As hereafter discussed, GATX has adequate protection.

■ The argument of GATX that allowing repossession of the rails and ties is not the same thing as abandoning a railroad line is both disingenuous and contrary to case law. If the rails and ties are repossessed, rail service ceases and much of the right-of-way reverts to third parties; the railroad line is no more. It would be a difficult task to explain to a Eureka shipper that the line had not been abandoned, merely repossessed and dismantled.

Further, abandonment of rails and ties was specifically held to be abandonment of a railroad line in *Matter of Boston & Maine Corp.* (1st Cir.1979) 596 F.2d 2, 6. In that case, the state of New Hampshire tried to use state courts to enjoin the bankruptcy trustees from removing the tracks and ties of a railroad line, arguing that federal regulatory authority over abandonment under the Bankruptcy Act did not include authority over the disposition of track and other materials. The Court of Appeals rejected this argument, stating:

> The State, in so arguing, assumes that an "abandonment" as affirmatively permitted by a reorganization court and the ICC can encompass only discontinuation of rail service, and not disposition of rail property as well.
>
> The State's view of what constitutes an abandonment is overly narrow and incomplete....
>
> Clearly ..., what is meant by a railroad "line" is not merely the service being provided but the physical properties and interests belonging to the debtor that constitute the line.

While *Boston & Maine* was decided under section 77(*o*) of the Bankruptcy Act, the wording and intent of that section are almost identical to section 1170 of the Code.[6]

---

5. The analogous section of the Bankruptcy Act limited initiation of abandonment proceedings to the trustee (see note 6, infra). This limitation does not appear in section 1170 of the Code.

6. Section 77(*o*) of the Bankruptcy Act provided, in pertinent part:

"The trustee ... shall determine what lines or portions of lines of railroad and what other property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting public

The most serious argument advanced by GATX for the proposition that its motion does not constitute a motion to abandon is based on the decision of the bankruptcy court in *In re Auto-Train Corp.* (Bkrtcy.D. C.1981) 11 B.R. 418. In that case, a labor union sought to force the trustee in a railroad case to continue operating a railroad line even though the trustee had reached a "hopeless and insolvable financial crisis." The court ruled that requiring the trustee to comply with section 1170 would be to require a "futile and useless gesture." 11 B.R. at 425.

The reliance of GATX on *Auto-Train* is misplaced, as the court there made it clear that its ruling would only apply in a situation where the railroad's financial position was *hopeless* and *insolvable*. The undisputed testimony of the Trustee in this case is that the railroad is presently operating and has expanded its business and revenue. While it may or may not be able to meet all of its expenses at this moment, there is no basis for a finding that its situation is either hopeless or insolvable, especially given the incentive of the affected counties to assist in saving the line.

In a related argument, GATX asserts that the enforcement of rights by a creditor cannot be deemed an abandonment, citing *Zirn v. Hanover Bank* (2nd Cir.1954) 215 F.2d 63, 69. GATX argues that the only exception is where the creditor is itself a common carrier, a status denied by GATX. *In re Auto-Train Corp.* (Bkrtcy. D.C.1980) 6 B.R. 510, 516. These arguments also do not stand close examination.

While it is one thing to say that circumstances beyond the control of the trustee or the court may result in termination of rail service without an abandonment authorized by the court, it is another to say that a motion for relief from the stay cannot be deemed a motion to abandon where the relief sought amounts to abandonment. *Zirn* involved a railroad which was forced to cease operations due to repossession of its rolling stock. Both under the Bankrupt-

cy Act as well as the present Code, rolling stock has been specifically exempted from bankruptcy stays or the exercise of injunctive powers by the courts. 11 U.S.C. section 1168; Bankruptcy Act, section 77(j). See generally Goldman, et al., "Repossessing the Spirit of St. Louis: Expanding the Protection of Sections 110 and 1168 of the Bankruptcy Code." 41 Bus. Lawyer 29 (November 1985). Thus, in *Zirn* termination of rail service occurred due to circumstances beyond the control of the trustee or the court, as did termination in *Meyers v. Arkansas & O. Ry.* (W.D.Ark.1960) 185 F.Supp. 36, where severe rains washed out the tracks. In this case GATX seeks an order of this court to repossess the rails, and such an order constitutes an order authorizing the line to be abandoned.

■ Additionally, the court finds that the common carrier exception to the "third-party creditor rule" would apply to GATX even if *Zirn* and similar cases were not distinguishable. While GATX itself may not be a common carrier, its close business arrangements with Southern Pacific, which is a common carrier, and the guarantee of GATX's investment by Southern Pacific preclude GATX from disclaiming the liabilities of a common carrier. To rule otherwise would be to exalt form over substance and encourage the evasion of laws and regulations by the use of intermediary entities with little or no actual interest in the matter.

3. Adequate Protection

GATX argues that it is entitled to relief from the automatic stay because it lacks adequate protection. Alternatively, it argues that it is entitled to "administrative rent" in the amount specified in the lease and, if the debtor cannot pay this rent, then it should have relief. For the reasons set forth below, the court finds that GATX is already adequately protected.

The Trustee and the other parties seeking to keep the railroad running have pointed to the Southern Pacific guarantee as

interest, and shall [petition the court] for authority to abandon or sell any such proper-

ty...."

being adequate protection. GATX concedes the existence of the guarantee, but states as "undisputable" that the guarantee is contingent, monetarily inadequate, and necessarily delayed. An examination of the guarantee document, entitled "Collateral Support Agreement"[7] and dated November 1, 1984, does not back up these assertions.

The Collateral Support Agreement in essence guarantees GATX that it will not suffer any loss in the purchase/lease transaction. It provides that upon default an amount sufficient to make GATX whole will be deposited into an interest-bearing trust account.[8] GATX is thereafter required to use its best efforts to repossess the tracks and ties for two years. On the second anniversary of the default, if GATX has not obtained repossession, then it will be entitled to all the funds in the escrow account and Southern Pacific will take up the responsibility for obtaining repossession on behalf of GATX. Southern Pacific agrees to indemnify and hold harmless GATX from any claims arising out of GATX's continuing ownership of the rails and ties.

The only contingency in the agreement which the court can see is the requirement that GATX do its best to repossess the rails and ties; GATX is doing that. While GATX will not be entitled to the escrow funds for another sixteen months or so, they are in the meantime earning interest. Only the issue of monetary insufficiency needs to be seriously addressed.

Citing no authority, GATX argues that the Southern Pacific guarantee is monetarily inadequate because while it does protect GATX's investment, it does not give it the full profit it expected to make on the transaction. The court can find no support for this proposition, and in fact the Bankruptcy Code envisions situations where creditors whose interest in property is insufficient to protect their full claim may be forced to sustain *losses* so long as they do not receive less than the value of the property. See, e.g., section 1129(b)(2)(A)(i).

In any event, it is clear that a third party guarantee can be a form of adequate protection. *In re Roane* (Bkrtcy. E.D.Pa.1981) 8 B.R. 997, aff'd 14 B.R. 542 (E.D.Pa.1981); *In re Harrow Leasing* (Bkrtcy.E.D.Va.1983) 35 B.R. 916, 921–22. There is also no requirement that in every case a lessor of equipment is entitled to adequate protection based on the contract rent or the lessor's profit expectation, as opposed to the value of the equipment. As *Collier* notes at 2 *Collier on Bankruptcy* (15th ed.), p. 362–59:

> "Other parties, such as cosignors, *lessors,* and co-owners are also entitled to demand adequate protection of their interest in the debtor's property. In any of those situations adequate protection is a flexible concept...." (emphasis added)

## CONCLUSION

The court finds that the Southern Pacific guarantee in the Collateral Support Agreement adequately protects the interest of GATX. Southern Pacific itself may be entitled to adequate protection if it chooses to step from behind GATX and assert its position itself; that issue is not now before the court.

The motion of GATX is denied.

---

7. Southern Pacific argues that a protective order issued by the district court in a prior case prohibits use of the Collateral Support Agreement, and it has not been available to the Trustee or other interested parties. However, pursuant to the protective order the court has received a copy and reviewed it thoroughly.

8. The exact amount is based on a sliding scale based on the time the lease went into default. Because default occurred early in the lease, Southern Pacific is required to deposit more than 99% of GATX's investment.