**In re AUTO–TRAIN CORPORATION, a Florida Corporation, Debtor.**

**Bankruptcy No. 80–00391.**

United States Bankruptcy Court, District of Columbia.

Sept. 26, 1980.

Murray Drabkin, Washington, D. C., pro se.

James Kearney, Webster & Sheffield, Washington, D. C., for trustee.

Robert W. Blanchette and Bernard Wayne Vance, Washington, D. C., for respondents Seaboard Coast Line and Richmond, Fredericksburg, and Potomac Railroad.

## MEMORANDUM OPINION

ROGER M. WHELAN, Bankruptcy Judge.

This matter came before the United States Bankruptcy Court for hearing on September 22, 1980, based on an application filed by the Trustee, Murray Drabkin, Esq., for an order to enjoin discontinuance of

Auto–Train rail service between Lorton, Virginia and Sanford, Florida by SCL and RF&P (hereinafter the combined respondents will be referred to as SCL). The latter railroads provide the track right–of–way[1] over which the debtor's trains transport its passengers (and automobiles) to the state of Florida. The services provided by SCL are vital to the Auto–Train operation and cessation of such services, as presently threatened by SCL because of substantial defaults, will clearly impede, if not, seal the doom of Auto–Train at the very inception of this reorganization filing.

In addition to a request for injunctive relief to prevent discontinuance of service, the Trustee also seeks to modify the existing rate charges assessed by SCL in connection with its railroad services. For the reasons set forth in this opinion, the Court grants the Trustee's prayer for injunctive relief, conditioned upon specific financial arrangements with this creditor; and denies, without prejudice, the prayer for modification of rates.

In order to place in proper perspective the Trustee's application for injunctive relief and the Court's ruling thereon, the following findings of fact are recited from the evidence of record.[2]

## FINDINGS OF FACT

Auto–Train's passenger service operations between Virginia and Florida are grounded upon an operating agreement entered into between the two above–captioned railroads and Auto–Train on August 1, 1970. This operating agreement which permits Auto–Train to use trackage rights over the combined rights–of–way of SCL and RF&P, as well as crew and related

---

1. In addition to trackage rights, the railroads also furnish train crews and emergency service to Auto–Train in connection with its passenger service operations. RF&P furnishes these services between Lorton, Virginia and Richmond, Virginia; while SCL continues the same essential services through the final destination point in Sanford, Florida.

2. This application for injunctive relief was scheduled for hearing on an expedited basis in view of the emergent circumstances presented.

Although testimony and documentary evidence (SCL's Exhibits 1 and 2 and ICC Decision Finance Docket No. 29276 [June 24, 1980]) were introduced and received in evidence, this hearing was not conducted as an adversary proceeding. In view of the fact that further relief may be requested by the parties in such an adversary proceeding, the recitation of facts will be abbreviated by reason of the nature of this expedited hearing.

emergency services, was approved by the Interstate Commerce Commission in 1971. *Auto–Train Rail Pass. and Auto Transport Serv.*, 342 I.C.C. 533 (1971).

On August 6, 1980, SCL, through its counsel, Robert Blanchette, directed a letter to Auto–Train notifying it that the operating agreement was terminated by reason of specified defaults (among others, arrearages totalling in excess of $4,000,000). Subsequently on September 3, 1980, notice was directed to the Interstate Commission that it "... has terminated the Operating Agreement dated as of August 1, 1970 among Auto–Train Corporation (AT), SCL and Richmond, Fredericksburg and Potomac Railroad Company (Operating Agreement)," but further stated that "[n]otwithstanding AT's defaults and without waiving its rights as a result thereof, SCL would be willing to permit AT's service to operate over its lines beyond September 10, if AT will, beginning with the trip scheduled on or next after September 5, 1980, pre–pay SCL for the costs, computed under the Operating Agreement, of operating each train."

SCL has indicated that it is willing, even at this point in time, to continue rail operations over its rights–of–way conditioned upon current payments. *See* SCL September 22, 1980 Memorandum of Law at 9, 14.

After well–publicized last–minute efforts to secure outside financing failed, Auto–Train filed its petition for reorganization under Chapter 11, Subchapter IV of Title 11, United States Code, on September 8, 1980. Pursuant to 11 U.S.C. § 151163, Murray Drabkin, Esq. was duly appointed Trustee on September 16, 1980.

In order to provide for uninterrupted train service for the prior intervening weekends, this Court approved an agreement which provided for the continuation of such train service (*See* Court Orders dated September 19, 1980 and September 23,

1980), and it now appears that the assessed charges by SCL have been paid–or will be paid from assigned and unprocessed credit card charges.

The testimony adduced to date indicates that the combined operating expenses attributable to the Virginia–Florida trips aggregate approximately $101,000.00.[3] Pro forma financial projections further establish that operating revenues are continuing unabated, but reduced by a factor of approximately 25.5% from this same season last year. Revenues are expected to increase in the coming winter months (October through February) by reason of seasonal travel to Florida, and the addition financial data supplied by Auto–Train's Assistant Comptroller, Mr. Agee, indicates sufficient revenues to meet operating expenses. (*See* Auto Train's Exhibit 1.) The financial projections, however, do reflect a deficit based on minimal projected earnings for this period of time.

There is at this stage of the reorganization case no specific financial data available for the Trustee as the Schedules and Statement of Affairs will not be filed until November 23, 1980.[4] There is clearly no basis at this point in time for the Trustee to analyze or structure in any meaningful way a plan of reorganization for this beleaguered debtor. It should be noted, however, that the Trustee has filed an application for authority to apply to the Secretary of Transportation for guaranteed certificates of indebtedness in an amount up to $3,000,-000. In view of creditor opposition, the Court has not yet acted upon this specific request.

Unlike most business reorganizations in this country, the nation's railroads, cast as they are in the shade of the "public interest," present unique and perplexing problems not only for the Courts, but, as illustrated by the remedial legislation emanating from the now–historic Penn Central

---

3. This represents round trips conducted between Virginia and Florida from Friday through Monday of each week. *See* Transcript of September 19, 1980.

4. A request for an extension of time to and including January 23, 1981, was filed by debtor's counsel, but the Court has directed that the Schedules and the Statement of Affairs be filed no later than November 23, 1980.

Reorganization, for the legislature as well. While the operations of Auto–Train appear unique in nature [5], their operations are nonetheless limited in scope and do not involve the movement of commercial freight. While the ultimate impact on the "public interest" still remains to be seen, one fact remains paramount at this stage of the reorganization case–thousands of individual citizens have made and are making reservations on Auto–Train and a sudden cessation of service at this time would have a deleterious impact on such individuals–not to mention the debtor railroad.

## I. *Injunctive Relief–Discontinuance of Rail Service*

Despite the facially appealing argument, advanced by able counsel for SCL, that this case presents an ordinary debtor–creditor relationship and that the Court cannot " . . . compel a post–petition provider of services or supplies to extend credit against his will", SCL overlooks the fact the parties entered into an agreement which has an effect on the "public interest." This is apparent by reason of the fact that SCL and Auto–Train negotiated a prior agreement for the purposes of postponing the repayment of certain funds due to SCL from Auto–Train. *See* ICC Decision Finance Docket No. 29276 (June 24, 1980). This

application was denied by the Interstate Commerce Commission. and the Commission specifically stated:

"Under the instant proposal, monies owed SCL as a general creditor may be paid before monies owed to the passenger public. Our duty to act in the *public interest* would be defeated by an exemption." *Id.* at 2. [Emphasis added]

The regulatory authority and the emphasis on the "public interest" by the Interstate Commission is abundantly clear to the parties and was so as late as June of 1980.

■ While the operating agreement itself is not before the Court at this time, the evidence of record which refers to specific portions of that agreement, establishes that SCL agrees to provide trackage rights to Auto–Train as well as crews and emergency services. While there is no lease of track to Auto–Train, at least in the conventional railroad sense, Auto–Train clearly is provided with operating rights over the rights–of–way of these two railroads. Irrespective of how this agreement is ultimately characterized [6]–either as an unexpired lease [7], an executory contract subject to assumption by the Trustee [8], or the use of property in which another " . . . entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased by the

5. The service of Auto–Train in transporting passengers, together with their automobiles, from Virginia to Florida involves the usage of approximately 800 miles in track. The Auto–Train slogan, "Train Your Car to Save Energy" reflects what might be one aspect of the "public interest" question in view of the energy crisis which has plagued this nation since 1973.

6. The Operating Agreement has not yet been admitted into evidence. The Court is therefore not in a position at this stage of the proceeding to determine the legal effect and ramification of the agreement.

7. In respect to unexpired leases, § 365(b)(4) of the Bankruptcy Code provides that:
"Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such

lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease."

8. Section 365(b)(1) provides, in similar fashion, that:
"If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee–
(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;
(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
(C) provides adequate assurance of future performance under such contract or lease.

Trustee," [9] the protection to which the creditor is entitled is clearly provided in the Code, namely, some form of protection as defined in the Bankruptcy Code.[10] In the case of an executory contract, or unexpired lease, the Code defines protection in somewhat different terms. *See:* § 365(b)(1), (4), *infra* at n. 7, 8.

Furthermore, in view of the fact that SCL, as a regulated carrier itself is a public utility which is rendering a service "... that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility," there is a further basis for the grant of relief to the Trustee within the limited 20–day parameters of this section alone. [H.R.Rep.No.595, 95th Cong., 1st Sess. 350 (1977). *See:* S.Rep.No. 989, 95th Cong., 2d Sess. 60 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787.] It is clear again, however, that "adequate assurance" of payment is mandated in order to avoid prejudicing the creditor's position.

Within the statutory framework of the Bankruptcy Code, by reliance on any of the above cited sections, there is a sufficient legal basis for the granting of the Trustee's prayer for injunctive relief at this time. The legislative history of this Code clearly reflects that the reorganization process is designed to afford a reasonable time frame within which the Trustee may seek to develop a plan of reorganization, while affording to creditors an appropriate form of protection or assurance. In applying the administrative powers (§§ 361–366 inclusive) available to a trustee within the reorganization context, there is, of course, no specific reference to the "public interest" standard. *See* 11 U.S.C. § 1166. Conventional rules of statutory construction, as well as the authoritative treatise commentary, would seem to mandate that the Court apply in the railroad reorganization the concepts of "adequate protection" or "adequate assurance" in the same manner as in non–railroad Chapter 11 cases. 5 *Collier on Bankruptcy* ¶ 1165.02 at 1165–3–1165–5 (15th ed. 1980). *See* 2A *Sutherland Statutory Construction,* § 57.10 at 428–429 (1973). Depending on the legal efficacy of the operating agreement, the specific form of "adequate protection" or "adequate assurance" should await further proceedings in order to best determine the relief to which each of the parties is entitled.[11]

While SCL argues that there can be no "adequate protection" because of the bleak financial picture of Auto–Train, they can-

---

**9.** Section 363(e) of the Bankruptcy Code provides that:

"Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such lease, sale, or lease as is necessary to provide adequate protection of such interest."

**10.** In reference to the use of property in connection with § 363, the term "adequate protection" is specifically provided for and is further defined in § 361:

§ 361. Adequate protection.
When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by–

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

**11.** As previously pointed out above in this Memorandum Opinion, the full development of facts and law is best suited to a proper resolution within the context of an adversary proceeding. In order for this Court to be fully apprised of all relevant facts concerning the operating agreement and at the same time to give full consideration to the rights of this creditor, the underlying legal issues concerning the operating agreement and the corresponding rights of the parties should await such an adversary proceeding.

didly state that they are not "... asking the Court to find that 'cashlessness' exists as to AT. They simply insist upon being paid currently, the post–petition credit of the debtor being nonexistent." See SCL September 22, 1980, Memorandum of Law at 14. Clearly neither the Court nor the Trustee is in a position to make such an omnipotent forecast at this time.[12] There has been received in the context of the emergency hearing on the Trustee's application the introduction of financial evidence that to some extent supports a credible basis for the projected payment of operating expenses–certainly an amount sufficient to cover the operating expenses of SCL. In view of the unique problems confronting this creditor, as outlined at the hearing on the Trustee's application, and because of the necessity on the part of the Trustee in utilizing the required services of SCL in connection with the passenger service operations of Auto–Train, the Court will direct the Trustee to continue making periodic payments to the creditor to the extent that funds are available. In the event there are insufficient funds from the current revenues, and this is of an obvious concern to all parties, the Trustee will be authorized to assign all unencumbered and unprocessed accounts receivable (credit card charges) to SCL as was previously effected by prior Court order to the extent necessary to pay each week's operating expenses. In the event that such current revenues and unprocessed accounts receivable are insufficient to meet the operating expenses of SCL, the Trustee may apply to this Court for further authorization to grant a lien on any other assets of the debtor which will be necessary to furnish protection to SCL. Based on the holding of this Court, the creditor is obviously free to pursue its rights by the filing of an adversary proceeding in order to obtain relief from the stay pursuant to § 362 of the Bankruptcy Code.

## II. *Required Resort to the ICC by SCL Prior to Discontinuance of Rail Service*

As a further basis for the granting of injunctive relief at this time, the Trustee asserts in his pleading that SCL is required to seek relief from the ICC before causing a discontinuance of rail service in respect to the operations of Auto–Train. Reliance is placed upon the fact that 11 U.S.C. § 1166 does not exempt the Trustee from "... the provisions of the Interstate Commerce Act (49 U.S.C. § 1 *et seq.*) that are applicable to railroads, ...". No reference, of course, is included within this statutory section with respect to the obligations of the railroad over whose tracks Auto–Train operates its trains.

The ICC regulatory scheme[13] envisions a minimum 30–day notice on the part of the

---

12. The Court is well aware of the onerous burden that confronts the Trustee in attempting to formulate a sound plan of reorganization under the emergent circumstances that have arisen in this case–a more detailed financial analysis must, of necessity, await the filing of the Schedules and Statement of Affairs.

13. The Trustee argues that the specific regulatory provisions of 49 U.S.C. § 10903 and 10908 mandate that a regulated carrier apply for authority to abandon or discontinue, prior to such abandonment or discontinuance. The pertinent statutory provisions are set forth as follows:

§ 10903:

(a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may–

    (1) abandon any part of its railroad lines; or

    (2) discontinue the operation of all rail transportation over any part of its railroad lines;

only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance.

§ 10908:

(a) When a discontinuance or change in any part of the transportation of a train or ferry operating between a place in a State and a place in another State–

    (1) is proposed by a carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission ...

the carrier ... may discontinue or change the transportation–

    (A) if it files a notice of the proposed discontinuance or change with the Commission at least 30 days before the discontinuance or change is intended to be effective and carries out the discontinuance or change under that notice;

    (B) if it mails a copy of the notice to the chief executive officer of each State in which the

regulated carrier and a proceeding by the Interstate Commerce Commission if commenced prior to the effective date of discontinuance. The key issue, as argued by SCL, is whether this mandatory application process applies to SCL in the context of this reorganization proceeding. SCL argues, by explicit reference to three cited cases [14] that the application must emanate from Auto–Train as the regulated carrier and not from SCL as its creditor. After a careful review of the cited authorities, the Court concludes that SCL is in error.

◼ In *Zirn, supra,* a case involving repossession of rolling stock by a secured creditor, the court held:

"To 'abandon' in this context means, we think to give up permanently, not merely to suspend operations for lack of physical equipment. No Commission approval is necessary where the cessation of operations results, not from the volition of the railroad or its bankruptcy–trustee, but from the exercise of the supervening rights, here recognized by the Bankruptcy Act, of third persons." 215 F.2d at 69.

While it is true that third parties are not involved in the administrative ICC proceedings envisioned by § 10908, SCL is a common carrier within its own right, and is an equal party to the operating agreement entered into with Auto–Train which was previously the subject of regulatory approval by the ICC. Accordingly, they cannot be deemed a mere third–party creditor in this sense. Their proposed letter of termination to the ICC (see SCL Exhibit 1) is an acknowledgment of the regulatory role in connection with the operations of Auto–Train and SCL. It is not only their services and crews which are being furnished to Auto–Train but the use of their tracks and right–of–way which is an indispensible element of the Auto–Train passenger service operation.[15] Moreover, SCL's reliance on the *New York, New Haven and Hartford R. R., supra,* is inapposite simply because the cited language referred to what would happen pending the abandonment process in that reorganization case. In the case before this Court, SCL is contending that it has a unilateral right to terminate its obligations to Auto–Train and the public without seeking any prior approval from the ICC. Auto–Train's failure to meet its contractual obligations, including substantial monetary defaults, under the operating agreement does not excuse SCL from complying with the mandatory statutory requirements of the Interstate Commerce Act. *Thompson v. Texas Mexican Ry.,* 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132 (1945). SCL is clearly then not a third–party creditor,[16] in this proceeding, but interestingly enough, even if SCL were a third–party creditor, there would be within the purview of 11 U.S.C. § 1168(a)(1) a 60–day period within which the trustee would be able to

---

train or ferry is operated and posts a copy of the notice at each station, depot, or other facility served by the train or ferry; and (C) except as otherwise provided by the Commission under this section.

It would appear from the careful review of the *statutory provisions set forth in Section 10903* that abandonment is not at issue in this case; rather a temporary discontinuance of rail traffic is being threatened by the carrier, SCL. Furthermore, the discontinuance which would result in an apparent temporary interruption of service on the part of Auto–Train, would not be a discontinuance "... of all rail transportation over any part of its railroad line;" § 10903(a)(2), and accordingly the provisions of § 10908 would therefore be applicable under the facts of this case.

**14.** These cases are as follows: *Zirn v. Hanover Bank,* 215 F.2d 63 (2d Cir. 1954); *Commonwealth of Pennsylvania v. Penn Central Trans-*

*portation Company,* 348 F.Supp. 28 (M.D.Pa. 1972), *aff'd,* 475 F.2d 1394 (4th Cir. 1973); and *In re New York, New Haven and Hartford R. R.,* 289 F.Supp. 451 (D.Conn.1968).

**15.** *Commonwealth of Pennsylvania, supra,* is not applicable under the facts of this case because the District Court, in denying a request for injunctive relief against Penn Central, was careful to note the role of the Interstate Commerce Commission in the abandonment process. The issue framed by the Court was in these words:

"The test which this Court must apply is whether it is equitable to permit Penn Central to continue suspension of service until the ICC decides whether permanent abandonment is appropriate." 348 F.Supp. at 30.

**16.** See *Zirn, supra.*

"... perform all obligations of the debtor under such security agreement, lease, or conditional sale contract, as the case may be ...".

In this context, the Bankruptcy Code clearly deviates from prior law under § 77(a) of the Bankruptcy Act, by reposing in the Bankruptcy Court, virtually complete authority over abandonment of a railroad line. *See* 11 U.S.C. § 1170. This section itself envisions, that abandonment must be not only after notice and hearing, but specifically envisions compliance with certain statutory tests as set forth in § 1170(a). However, the statute, as phrased, deals specifically with abandonment and not with discontinuance. The abandonment process, which by its nature is a complete relinquishment with no intention of resumption, still envisions participation on the part of the Interstate Commerce Commission. Because the overall regulatory power of the Interstate Commerce Commission is not expressly exempted in 11 U.S.C. § 1166, provisions for discontinuance would logically be within the regulatory realm of this Commission. Moreover, since SCL is a regulated entity and a party with equal standing under the operating agreement, it follows that any action taken by them which would result in a discontinuance of service, should first be submitted to the Interstate Commerce Commission for approval. Even a change with respect to deferments of payments under the Operating Agreement between these parties was previously submitted for approval to the Commission. *See* ICC Decision Finance Docket No. 29276 (June 24, 1980).

Such an approach is, moreover, consistent with the reorganization goals of Chapter 11. To permit unilateral cessation of service by SCL, without resort to the regulatory procedures set out above, would doom reorganization efforts from their very inception. Furthermore, the role of the Bankruptcy Court in respect to abandonment procedures itself, whenever such a final step is envisioned, would more logically be in connection with the development of the plan of reorganization itself.

As evidenced by the specific sections of 49 U.S.C. § 10908, the application procedure to be followed is not likely to impose a hardship on a railroad in view of the fact that an express 30–day period is provided for within that section. The Commission, in turn, is mandated to begin its proceedings prior to the proposed date of discontinuance.[17] The letter notice, directed to the Interstate Commerce Commission by SCL on September 3, 1980, would not appear to be in substantial compliance with this statute simply because, *inter alia*, it does not provide for a 30–day notice "... before the discontinuance or change is intended to be effective ..." 49 U.S.C. § 10908(a)(2)(A).

Accordingly, based on this Court's holding, it will be incumbent upon such creditor to apply for relief from the stay based on the provisions of the automatic stay as set forth in § 362(a)(1).[18]

## III. *Requested Reduction in Rates*

The Trustee, in an effort to alleviate what is an obvious cash flow problem, has requested that the existing payment of full charges (variable plus direct costs) to SCL be modified in order to permit payment of the variable expenses alone to SCL pending a determination by the ICC as to what is a reasonable charge. The ICC has clearly statutory authority for such matters and this, of course, has not in any way been

---

17. The Court would, in view of the unique services provided by Auto–Train, expect that the Interstate Commerce Commission would render an advisory opinion with respect to the nature and extent of the "public interest" to be served in this case. This is particularly important in a reorganization where the operation of Auto–Train appears limited in scope and where substantial creditor interest will be affected by any untoward delay in the reorganization process.

18. § 362(a)(1) specifically provides that:

"(a) ... this title operates as a stay, applicable to all entities, of—
(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other proceeding against the debtor that was or could have been commenced before the commencement of the case under this title ...".

altered by the new Code. *See e. g.*, 11 U.S.C. § 1129(a)(6). Such a request by the Trustee is grounded on the broad equitable powers of this Court as a court of equity. The evidence adduced by the Trustee during the emergency hearing, however, does not in this Court's opinion warrant the granting of such relief. It is undisputed that the present charges assessed by SCL, pursuant to the Operating Agreement, are based on the original operating agreement entered into between the parties in August of 1970. With the exception of the vague and undocumented testimony of Richard Goldstein, vice president of Auto–Train,[19] there is absolutely no evidence of record to support a modification of the existing rate charges at this time. This is a matter properly relegated to the administrative expertise of the Interstate Commission, and the modification of rates by this Court would be an unwarranted infringement on the regulatory authority of the Commission. Upon request by the Trustee, the Court will formally request the Commission to expedite an examination of such matters in order to provide relief on an expedited basis in connection with the continued operations of Auto–Train.[20]

In order, however, for there to be a basis for a proper review of rate charges, and for purposes of detailed accounting by the Trustee during the period of continued operations, the Court will direct that SCL furnish the Trustee with complete itemized charges in respect to all billings.

## CONCLUSION

This Court is not insensitive to the plight in which SCL finds itself; however, the Bankruptcy Code, as best reflected by its extensive legislative history, has attempted to balance the rights of the debtor with its creditors within the framework of an extensive reorganization mold. While the reorganization should not be jeopardized with sudden death at its very birth by the precipitous and untoward actions of any creditor, neither this Court nor the new Code envisions that the reorganization be "a long and hazardous journey through a dark and seemingly endless tunnel ..." (In re *New York, New Haven, and Hartford R. R.*, 289 F.Supp. 451, 457 (D.Conn.1968). With the skill and expertise of an experienced Trustee, and with reasonable cooperation of all parties in interest, the light at the end of the tunnel may appear sooner than anticipated.

---

**19.** Mr. Goldstein had testified that there was a mention of a 50% profit margin in connection with the conversation with Mr. Sanborn of SCL, but the conversation itself occurred over 1½ years ago and was not substantiated by reference to any figures.

**20.** As highlighted in 5 *Collier on Bankruptcy* ⁋ 1165.02, at 1165- 5 (15th Ed. 1980):

"It is apparent that under the Code the balance between the public and private interest is quite different than it was under Section 77 of the Act. Preservation of rail service remains a statutory objective, but, because of the greater protection accorded secured creditors generally under the Code, continuation of rail services during the reorganization may well be more difficult. Ultimately, this change in the balance between public and private interests means that railroad corporations experiencing financial difficulty will have to act more quickly than they have in the past if Chapter 11 is to be a viable remedy for them."