In the Matter of CHICAGO, MISSOURI & WESTERN RAILWAY COMPANY, an Illinois Corporation EIN–36–3432191.

Daniel R. MURRAY, Trustee of the Chicago, Missouri & Western Railway Company, an Illinois Corporation, Plaintiff,

v.

MOBIL CHEMICAL CO., a Delaware Corporation, Defendant.

Bankruptcy No. 88 B 05141.
Adv. Nos. 90 A 0735, 90 A 0362.

United States Bankruptcy Court, N.D. Illinois, E.D.

July 7, 1993.

Joan Fencik, Wildman, Harrold, Allen & Dixon, Chicago, IL, for Mobil Chemical Co.

Randall Mehrberg, Jenner & Block, Chicago, IL, for trustee.

## MEMORANDUM OPINION

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on Defendant's Motion for Partial Summary Judgement against Plaintiff, Daniel R. Murray, Trustee (the "Trustee") of the Chicago, Missouri & Western Railway Company ("CMW"), dismissing the Trustee's claims for freight and demurrage charges for transportation services provided by CMW or, in the alternative, the referral of these issues to the Interstate Commerce Commission ("ICC") and for a stay of these proceedings pending resolution by the ICC. The Court, having considered the memoran-

da of law and affidavits submitted by the parties, now rules as follows.

### FINDINGS OF FACT AND PROCEDURAL BACKGROUND

The Defendant, Mobil Oil Corporation ("Mobil") operates a manufacturing facility at Jacksonville, Illinois, where it produces plastic bags and other products. This operation requires that a large volume of synthetic plastic materials be delivered to the Jacksonville plant. These materials are typically shipped by railroad from various locations outside of Illinois. On April 28, 1987, the CMW began operations as the rail Company which succeeded the former Illinois Central Gulf ("ICG") in providing rail transportation service to Mobil's Jacksonville plant.

On April 1, 1988, the CMW commenced railroad reorganization proceedings under the Bankruptcy Code and, on May 11, 1988, Daniel R. Murray was appointed Trustee. Murray operated the CMW until the cessation of railroad operations on or about January 10, 1990. As a rail carrier, the CMW was subject to the jurisdiction of the Interstate Commerce Commission ("ICC") and the jurisdiction of the Illinois Commerce Commission ("Ill CC").[1] The CMW had adopted and provided rail service under the tariffs filed with the ICC by its predecessor, the ICG.[2] The Trustee, however, did not formally adopt the CMW's tariffs pursuant to 49 CFR § 1312.20(b) or file and publish new tariffs with the respective agencies after his appointment.

Between April of 1987 and November 1, 1989, CMW transported rail cars for Mobil. A portion of this transportation involved the movement of CMW carriers between Jacksonville and other locations in Illinois. Part of the basis of CMW's Complaint involves those carrier movements in and around Mobil's Jacksonville facility. The CMW rail cars would move within the Mobil plant, sometimes on tracks that did not constitute Mobil's "industry track". Part of the track on which the CMW cars moved within the Mobil plant was owned or leased by CMW. One of the issues raised by CMW's Complaint is whether these inner plant carrier movements were "intraplant" switching or "intraterminal" switching as defined by Item 5000 of Freight Tariff ICG 8000–E and Item 100 of Freight Tariff CMNW 8000–A.[3] Resolution of that issue is necessary in order to determine the applicable freight charge to be assessed to the carrier's movement. Intraplant switching movements carried a lower tariff rate than "intraterminal switching". Trustee contends that CMW's carrier movements primarily constituted "intraterminal" switching while Defendant characterizes the switching movements as "intraplant". The Trustee maintains that the amounts owing to CMW for these switching movements total $253,574.00 for prepetition shipping and $566,119.00 for post-petition shipments.

On or about July 7, 1989, CMW and Mobil entered into a contract (ICC -CMNW –C–0445), covering CMW transportation between Springfield, Illinois and

---

1. Interstate Commerce Act, 49 U.S.C. sec. 10101, *et seq.;* Illinois Commercial Transportation Law, Ill.Rev.Stat. Ch. 95½, ¶ 18c–1101, *et seq.*

2. CMW's Adoption Notice—Freight Tariff No. CMNW 9000 (effective April 28, 1987). This Adoption Notice effectively adopted, ratified all freight tariffs, classifications, rules, notices, traffic agreements and other authorities and powers that had been filed with the ICC by the Illinois Central Gulf Railroad Company under the ICC's Freight Tariff ICG 8000–E (effective December 31, 1986). Additionally, CMW's Freight Tariff No. CMNW 9000 also effectively adopted the rates set forth in Items 7950 and 9681–A of Freight Tariff WTL 2002–W (effective January 28, 1985). The WTL 2002–W Tariff was originally issued by Western Trunk Lines and it

included the Illinois Central Gulf Railroad Co. In its list of its participating carriers. WTL 2002–W Tariff prescribed the rates for the transport of Synthetic Plastics Pellets between Auburn, IL, Woodson, IL, Roodhouse, IL Murrayville, IL, Springfield, IL and Jacksonville, IL.

3. The crux of the "intraterminal"/"intraplant" switching dispute concerns the definition of those terms and how the CMW's carrier movements are characterized in relation to the definitions. The parties allege that tariffs, ICG 8000–E and CMNW 8000–A provide definitions for the terms, however, both Defendant and Plaintiff have arrived at different conclusions as to which category accurately describes the movement of CMW cars within the Mobil plant.

Jacksonville, Illinois. This contract covered CMW's shipments of Synthetic Plastic Pellets to Mobil's facility in Jacksonville after May 1, 1989. Murray claims that under this contract, CMW transported the plastic pellets from various locations within the state of Illinois to Jacksonville, Illinois. These locations included Auburn, IL, Woodson, IL, Roodhouse, IL, and Murrayville, IL. Mobil maintains that the contract provided only for shipments between Springfield, Illinois and Jacksonville, Illinois. Under the contract, CMW provided shipments to Mobil which CMW has calculated at a charge of approximately $1,299,429.00. Mobil admits that it is indebted to CMW for some of the rail moves but disputes the amount claimed by the Trustee and argues that such indebtedness has been fully paid.

Also in dispute is Murray's allegation that the rail Company is indebted to CMW for railroad cars constructively placed at various CMW track locations in Illinois for the account of the Defendant. Murray claims that these cars remained on the tracks beyond the free time permitted in the tariffs filed by CMW. Thus, the Complaint alleges that Mobil is obligated to pay demurrage charges pursuant to Freight Tariff PHJ 6004-0 (PHJ Series), Supplements 78 and 104 to Freight Tariff RPS 6004-0. Mobil denies that it requested such transportation placement services from CMW and that it is indebted to the rail Company for demurrage charges.

Finally, Murray asserts that between April 28, 1987 and January 10, 1990, a warehouse owned by Mobil at the Jacksonville plant extended or encroached upon real estate then owned by CMW. Moreover, CMW maintains that Mobil constructed an overhead manifold near the site of the warehouse and that this structure infringed on air rights then owned by CMW. CMW contends that neither the real estate nor the air rights that it owned were leased from CMW by Mobil. The Trustee seeks compensation for the use of these properties while Mobil denies that the it utilized or infringed on CMW's real estate or air rights.

On the issues of freight undercharges and demurrage charges, Mobil raises as affirmative defenses the claim that the Trustee's freight undercharge claims and demurrage charges are inapplicable and unreasonable. Mobil also disputes the Trustee's interpretation of CMNW Contract ICC–CMNW–C–0445 regarding CMW's rail car movements and destinations between Springfield and Jacksonville, Illinois. Mobil contends that the contract does not apply to the rail movements claimed by the Trustee. Mobil also denies that it has infringed on CMW real estate or air rights. Mobil requests that this Court grant its Motion for Partial Summary Judgement on the issue of the Trustee's claim of freight undercharges and demurrage charges. However, if the Court denies the Partial Summary Judgement, Mobil requests that the Court refer the matters of freight undercharges and demurrage charges to the Interstate Commerce Commission for resolution. Mobil's request for referral is based on its claim that these issues are under the exclusive and primary jurisdiction of that Agency.

On May 14, 1993, the Court invited the parties to address several questions raised by the various motions of Defendant, Mobil for Summary Judgement. Both parties filed supplemental briefs on May 28. The Trustee's supplemental brief noted that should this Court find that Mobil has a colorable counterclaim that should be referred to the ICC, the Trustee is willing to hold in escrow any amounts awarded to the Trustee by the Court until the final adjudication of the counterclaim.

## DISCUSSION AND CONCLUSIONS OF LAW

■ The issues in this case are of first impression in this Circuit. This is not the typical carrier undercharge case. Generally, a carrier undercharge case arises when a motor carrier seeks to collect undercharges from a shipper with whom it had privately negotiated a rate lower than the carrier's tariff rate on file with the Interstate Commerce Commission. The tariff is a "publication containing rates, classification ratings, rules, regulations, and other provisions as amended, filed in the carrier's

or an agent's name." *Freightcor Services, Inc. v. Vitro Packaging, Inc.*, 969 F.2d 1563, 1566 (5th Cir.1992). Under the "filed rate doctrine", the rate that a carrier has duly filed with the ICC is the only lawful rate that it can charge for its services and deviation from it is not permitted upon any pretext. *Maislin Industries, U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 127, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990); *citing: Louisville & Nashville R. Co. v. Maxwell*, 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915).

In many of these cases, the motor carrier has sought relief under bankruptcy and a trustee is appointed to administer the rail company's estate. Typically, the trustee reviews the carriers' financial records and discovers the discrepancy between the filed tariff rates and the lower negotiated rates which the shippers paid. The trustee then makes claim against the shippers to pay into undercharge or the difference between the discounted rates they had been charged and the tariff rates actually on file with the ICC. The trustee may claim undercharges for both prepetition and postpetition shipments.

In the typical case there is no question but that the carrier had a filed tariff rate on file with the ICC because the existence of the filed tariff is a condition precedent to recovery under the "filed rate doctrine". The instant case is atypical because one of the issues is whether an enforceable filed rate existed at the time of the shipments in question. The crux of Mobil's allegations against the Trustee is that CMW's filed tariffs were never legitimately adopted by the Trustee and therefore not legally applicable to the undercharges claimed. Additionally, Mobil claims that the CMW also failed to effectively adopt the ICG's intrastate tariffs when that Company took over ownership of the ICG rail company. The undercharges which the Trustee claims for CMW's prepetition period are based on intrastate tariffs. In essence, Mobil alleges that all of the Trustee's undercharges are based on tariffs that were legally nonexistent for use by either the CMW or the Trustee.

## STANDARDS FOR SUMMARY JUDGEMENT

Rule 56(c) of the Federal Rules of Civil Procedure, which applies to bankruptcy adversary proceedings pursuant to Bankruptcy Rule 7056, states that a motion for summary judgement should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The primary purpose of summary judgement is to avoid unnecessary trials in cases where no material factual issues are in dispute. *Wainwright Bank & Trust Co. v. Railroadmen's Fed. Saving and Loan Ass'n*, 806 F.2d 146, 149 (7th Cir.1986).

The party moving for summary judgement has the burden of establishing the lack of a genuine issue of material fact. *In re Hart*, 130 B.R. 817, 822 (Bankr.N.D.Ind. 1991) (*citing Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir.1984) and *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984). If the moving party meets this burden, the non-moving party must then respond by setting forth specific facts which demonstrate the existence of a genuine issue for trial. Fed.R.Civ.Pro. 56(e); *Posey v. Skyline*, 702 F.2d 102, 105 (7th Cir.1983). The party opposing summary judgement may not merely rest upon allegations and denials in its pleadings. Fed.R.Civ.Pro. 56(e).

When ruling upon a summary judgement motion, a court must consider the entire record, and must draw all reasonable inferences and resolve all factual disputes in favor of the non-moving party. *Mid–State Fertilized v. Exchange Nat'l Bank of Chicago*, 693 F.Supp. 666, 669 (N.D.Ill.1988). The court must grant the summary judgement motion unless it finds that the party opposing summary judgement has presented sufficient evidence which, if believed, would allow a reasonable jury to return a verdict for the non-moving party. *Hart*, 130 B.R. at 822 (*citing Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d

656, 659 (7th Cir.1987). Thus, it is not enough for the non-moving party to establish the existence of a factual dispute. The facts in dispute must be *material;* they must have the potential to affect the outcome of the case under the applicable law. *Hart,* 130 B.R. at 822. While the court does not *weigh* the evidence presented with regard to a summary judgement motion, the court must assess the *sufficiency* of the evidence to support a verdict in light of the evidentiary standard of proof that applies to the issue(s) in the case at hand i.e. preponderance of the evidence, clear and convincing evidence, etc. *Hart,* 130 B.R. at 822 (*citing Valley Liquors,* 822 F.2d at 659.

## MOBIL'S REQUEST FOR PARTIAL SUMMARY JUDGEMENT

### I. TRUSTEE'S FREIGHT UNDERCHARGES AND DEMURRAGE CHARGES ARE NOT APPLICABLE

■ Mobil maintains that the Trustee never adopted, filed or published any tariffs for the CMW with the Interstate Commerce Commission. Mobil concludes that the Trustee had no legal rates applicable to transportation provided by CMW from May 11, 1988, the date of the Trustee's appointment, until CMW terminated its railroad operations. Thus, the Trustee cannot rely upon such tariffs to support a claim for tariff undercharges. Mobil contends that no genuine issue of material fact exists in the instant case because the Trustee had no valid tariffs on file with the Interstate Commerce Commission and, therefore, cannot invoke the "filed rate doctrine".

According to Mobil, the Trustee had no lawful tariffs on file because the Trustee failed to adhere to regulations promulgated under the Interstate Commerce Act which provides under 49 CFR § 1312.20 that:

(1) Adoption notices shall be filed to reflect new ownership or control when—

(i) A carrier's name is lawfully changed;

(ii) A carrier's operating authority is transferred, entirely or partially; or

(iii) A fiduciary (receiver, trustee. etc.) assumes possession and control of a carrier's property; and when the carrier wishes (for whatever period) to use the old carrier's tariff(s)

(2) In addition to the adoption notice, an adoption supplement shall be filed to reflect the new carrier's adoption of the old carrier's tariff(s).

Mobil maintains that the Trustee's is bound to adhere to the requirements of 49 CFR § 1312.20 by 11 U.S.C. § 1166, which subjects the "trustee and the debtor ... to the provisions of subtitle IV of title 49 for railroads". Mobil claims that because the Trustee admits his failure to adopt or publish any tariffs, the Trustee had no enforceable tariffs or filed rates with which to assess undercharges as a matter of law.

Although Mobil points out that § 1312.20 establishes an expectation that a fiduciary is required to adopt an "old" carrier's tariffs if the Trustee is to rely on them, the provisions of § 1312.20 do not, by there terms, specify the consequences of a trustee to not formally adopt previously filed and published tariffs. Therefore the Court must address this issue by analyzing the impact of 11 U.S.C. § 1166 and its stipulation that a trustee in a railroad reorganization case is required to comply with the provisions of the Interstate Commerce Act. § 1166 provides that:

the trustee and the debtor in a railroad reorganization case are subject to the provisions of the Interstate Commerce Act (subtitle IV of title 49) and thus to the overall regulatory power of the Interstate Commerce Commission.

Section 1166 further provides that the trustee is generally subject to orders of any federal, state, or local regulatory body to the same extent as the debtor would be if the Chapter 11 case had not been filed.

This general rule, however, is subject to exceptions[4] 5 Bkr.L.Ed., § 46:27,

---

**4.** The exceptions to § 1166 give the Bankruptcy court virtually complete authority over the abandonment of a railroad line. These exceptions also provide that mergers, modification of

the financial structure of the debtor, or issuance or sale of securities under a plan are exempt from the normal regulatory jurisdiction; such matters are generally covered by the plan con-

at 19. The exceptions, however bear no relevance to the issues in this case.

Thus, § 1166 indicates that a trustee as well as the debtor must comply with the regulatory authority of the Interstate Commerce Commission and the statutory requisites of the Interstate Commerce Act. Moreover, § 1166 makes the obligation in 49 CFR 1312.20 a responsibility of the Trustee and that obligation should not be taken lightly. *See: In re Auto–Train Corp.*, 6 B.R. 510, 515–516 (Bankr.D.C. 1980). (where court gives credence to the overall regulatory authority of the Interstate Commerce Commission via the mandates of § 1166) Although § 1166 has been characterized as an "exempting" statute, serving a narrow purpose, the exceptions it authorizes are not factors in issue in this case. Thus, as one commentator has noted, "unless there is a specific exemption in the Code, all chapter 11 debtors are subject to applicable government regulations." Collier on Bankruptcy, at 1166–1, 15th ed. (1991). Therefore, § 1166 lends support to the notion that a trustee is bound by the provisions of subtitle IV of title 49.

■ Trustee maintains that he was not required to file an adoption notice with the ICC because CMW's established tariffs automatically became property of the estate by operation of Section 541 of the Bankruptcy Code. Section 541 of the Code provides:

> Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any ... applicable nonbankruptcy law—
>
> (A) that restricts or conditions transfer of such interest by the debtor;

11 U.S.C. § 541(c). Further, the Trustee notes that filed tariffs are within the wide range of interests that are considered "property" of the debtor. These interests

would remain "property" of the estate after the debtor petitioned for bankruptcy. Trustee relies on *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 203, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983), where the Court emphasized that in enacting § 541, "Congress intended a broad range of property to be included in the estate," and that § 541's definition of property is "broad in scope." *Id.* at 204–05, 103 S.Ct. at 2313–14. Moreover, the Trustee maintains that enactment of 11 U.S.C. § 541 takes precedence over 49 C.F.R. § 1312.20 because § 541 "specifically operates to override any non-bankruptcy law that would prevent the Trustee from obtaining all the property of the estate." However, the Trustee makes no attempt whatsoever to square the apparent inconsistency between § 541 and § 1166, especially as to the conflict between the Trustee's reading of § 541 and the incorporation of the Interstate Commerce Act and § 1312.20 through 11 U.S.C. § 1166.

Trustee further suggests that because 49 C.F.R. § 1312.20 is a regulation promulgated by the I.C.C. rather than a statute enacted by Congress, it must be superceded by the federal legislation of § 541. Further, the Trustee notes that since § 1312.20 was originally promulgated in 1913, its regulatory requirements must be overtaken by the later enactment of Bankruptcy Code § 541. The Trustee provides no authority for these conclusions. In fact, these conclusions run contrary to case law. *New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *In re Auto Train*, 6 B.R. 510. Additionally, even though 49 C.F.R. § 1312.20 was promulgated in 1913, there is nothing in later or current transportation regulations or federal legislation which suggest that the effect of § 1312.20 on rail reorganization administration has been altered or diminished by subsequent legislation. Indeed § 1166 of the Bankruptcy Code became law at the same time that § 541 was enacted.[5] This

---

tents provisions set forth in Bankruptcy Code §§ 1123 and 1172. Bankruptcy Service, L.Ed. § 46:27, p. 19.

5. Section 541 was promulgated under Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2594; Section 1166 was enacted under Pub.L. 95–598, Nov. 6, 1978, 92 Stat. 2642.

Court concludes that Congress did not enact two mutually inconsistent statutes. Section 1166 adopts the requirements of title 49 and those requirements are not in conflict with Bankruptcy Code's § 541. An examination of the Trustee's arguments will demonstrate the fallacy of his position.

If CMW had valid tariffs on file prepetition, any right to recover on those undercharges would be property of the estate. *Maislin Industries*, 497 U.S. 116, 110 S.Ct. 2759; *In re Bulldog Trucking, Inc.*, 150 B.R. 912 (W.D.N.C.1992). But the Trustee's position goes further. He argues that the tariffs filed prepetition are property of the estate and to the extent that § 1312.20 conditions the estate's interest in those tariffs by requiring adoption, § 1312.20 is in conflict with the Bankruptcy Code and, therefore, invalid. The Trustee's argument that the broad scope of § 541 automatically made the old CMW tariffs property of the Bankrupt's estate misconstrues two critical points. First, Trustee states that:

> Section 1312.20 does not apply in these circumstances, because by its terms it requires an adoption notice to be filed only when a carrier wishes to use the "old carrier's" tariffs, and "old carrier" is defined as the "carrier or party *whose name is changed or whose operating authority is transferred.*" ... CM & W changed neither its name nor its operating authority, ... therefore, Section 1312.20 is inapplicable to the CM & W.

However, the Trustee ignores subparagraph, (iii) of 1312.20 which states that adoption notices shall be filed "when a fiduciary (receiver, trustee, et cetera) assumes possession and control of a carrier's property; and when the carrier wishes (for whatever period) to use the old carrier's tariffs." Trustee has not explained why subparagraph (iii) of 1312.20 is not applicable to his administration of CMW's estate.

Second, the Trustee extends the "broad scope" of § 541 to include property interests which either no longer exist or which have been nullified because of the failure of the Trustee to preserve them. There is nothing in the legislative history of § 541

which suggests that this statute is *all encompassing*. In fact, *Collier* notes that:

> the bankruptcy system functions within the larger context of the federal system, complete independence from nonbankruptcy law is not possible. Section 541 of the Code, as did Section 70 of the Bankruptcy Act, provides a system for dealing with the debtor's interest in property and his debts. ***However, the existence and nature of the debtor's interest in property, and of his debts, are determined by nonbankruptcy law.*** (emphasis added)

*Collier*, ¶ 541.02, at 541–10.1.

There are two ways that the Interstate Commerce Commission could have approached the problem of filed rates and a carrier who files for relief under the Bankruptcy Code. It could have said that the old filed rate is binding upon the Trustee until such time as the Trustee acts affirmatively to file a new rate or to disavow the old rate. This would have been a reasonable approach. If this had been the regulatory solution then clearly the right to use the old filed rate would be a "right" belonging to the estate.

It would have been just as reasonable for the Commission to resolve the problem from a different direction—by providing that the old filed rate is not binding upon the Trustee (and the carrier in reorganization) until such time as the Trustee acts affirmatively to adopt the old rate. This approach is also reasonable. This is what § 1312.20 does and under the terms of that provision the right to use the old filed rate is not a "right" belonging to the estate, absent the filing of an adoption notice. The Trustee fails to provide any convincing policy reasons why this latter approach collides with the policy of the Bankruptcy code as that policy is articulated in 11 U.S.C. § 541. § 1312.20 does not deprive the estate of a right, it merely requires the estate representative to affirmatively act to preserve that right, if the estate wishes it. This Court can discern no discriminatory purpose behind § 1312.20. It appears to be a rational and neutral regulatory provision, therefore, this Court concludes that

§ 1312.20 does not conflict with 11 U.S.C. § 1166.

■ The Trustee cannot deny the effect and the interrelationship between 1312.-20(2)(b)(iii) and Bankruptcy § 1166. Tariffs that are not properly adopted by a trustee or debtor after the debtor petitions for bankruptcy become void if they are not preserved through the procedures of § 1312.20 of title 49. In essence, CMW's "old" or previously used tariffs are technically voided by the Trustee's failure to provide notice of their continued use post-petition. The Trustee's failure to file adoption notices and supplements with the Interstate Commerce Commission limits the tariff "rights" that can become "property" under the broad scope of Bankruptcy's § 541. This analysis comports with a recent Interstate Commerce Commission decision concluding that "the tariffs of the old carrier do not transfer automatically" if a new carrier or one whose possession and control has changed wishes to use an old carrier's tariffs. *BGR Transportation Co., Inc.,* 1 I.C.C.2d 404, 1984 WL 49399 (May 17, 1993).

Although the *BGR* case is not directly on point, it identifies categorically the risks a carrier runs when it fails to promptly adopt an old carrier's tariffs that it has actively used. In *BGR,* the carrier changed its name in 1988 and failed to promptly adopt the old carrier's tariffs or publish its own tariffs under its new name. When the carrier later ceased operations and entered bankruptcy, it attempted to collect undercharges based on the tariffs it never adopted. In January, 1993, BGR submitted adoption publications dated February, 1988, to the Interstate Commerce Commission. The Commission rejected the adoption publications because BGR had failed to comply with the Commission's regulation at 49 CFR 1312.20(A), (b) and (h). Further, the Commission Chief noted that the adoption publications were submitted 59 months after BGR changed its name. The primary basis for this rejection was that BGR had not promptly filed the adoption publications as required by the regulations.

Adoption publications filed 59 months after BGR's name change took effect cannot reasonably be interpreted as having been filed "promptly" as required by the regulations...Moreover, the filing of such publications is relatively simple to accomplish...A delay of nearly 5 years, of a statutorily required action that is easily performed, does not constitute "prompt" performance.

*See: BGR.*

Although the Trustee suggests that *BGR* is irrelevant to the instant case because the Commission did not confront the issue of whether 11 U.S.C. § 541 overrides § 1312.20, the Trustee misses the essential point of *BGR:* failure to adopt under § 1312.20 rendered the old tariffs unenforceable. The Commission disallowed BGR's use of the carrier's old tariffs because the ICC determined that the old tariffs did not automatically transfer to the new carrier when it changed its name, and therefore, the old tariffs were invalid.

Here, the Trustee, failed to promptly adopt the old tariffs as required by § 1312.20 after his appointment. The Trustee's operation of CMW continued for more than 19 months and at no time did the Trustee file adoption notice and supplements with the ICC as required by § 1312.-20. However, the Trustee bases all of his undercharges on the old CMW tariffs. Given the mandates of 1312.20, the Court concludes that CMW's tariffs did not automatically transfer when the Trustee was appointed. Because there was no transfer, there were no valid tariffs. The Court holds that the failure of the Trustee to adopt the old tariffs pursuant to 1312.20 effectively nullified their use postpetition by operation of law.

■ Section 541 does provide the debtor the ability to retain a wide range of property interests after filing for bankruptcy protection. Therefore the Court does not find it necessary to pursue the issue of whether a filed and published tariff rate is a property interest of a carrier under § 541 postpetition. However, the Court does reject the Trustee's assertion that an *unadopted* tariff is a *valid* property interest of the es-

tate. Bankruptcy Code § 541 is not relevant here because any property rights which CMW may have had in the old tariffs were invalid pursuant to § 1312.20. Thus, any postpetition undercharge claims by the Trustee based on CMW's "old" tariffs are also invalid.

The Trustee refers the Court to *Overland Express, Inc. v. Interstate Commerce Commission,* as the most recent authority which concludes that the ICC is severely limited in its ability to retroactively reject a filed tariff. 996 F.2d 356, 1993 U.S.App. LEXIS 14833 (C.A.D.C.1993). The *Overland* case points to the Supreme Court's decision in, *ICC v. American Trucking Associations,* 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984), which held that although the "Commission could reject tariffs at the time of filing and could cancel the prospective effect of tariffs, it lacked any general authority to invalidate tariffs that it had accepted for filing without objection." *Overland Express, citing: American Trucking,* at 361–364, 104 S.Ct. at 2462–2464. The Trustee's cites *Overland Express* to suggest that the ICC might be overstepping its statutory authority if it were to retroactively invalidate CMW's filed tariffs because of the Trustee's failure to adopt such tariffs. However, the Supreme Court in *American Trucking* noted that the Commission could reject a tariff retroactively only if that rejection "furthers a specific statutory mandate of the Commission." *Overland Express, quoting: American Trucking,* at 367, 104 S.Ct. at 2465. And, the Supreme Court noted this authority of the ICC is discretionary. In the instant case, Murray has not shown that if the Commission were to require the Trustee's adherence to the requirements of § 1312.20 that it would *not* be in the interests of furthering the Commission's statutory mandates.

Thus, on the issue of the inapplicability of the Trustee's postpetition undercharge claims, the Court concludes that no genuine issue of material fact exists because the Trustee failed to adhere to the requirements of § 1312.20 pursuant to Bankruptcy's § 1166. There were no valid postpetition tariffs. However, because resolution of this issue does not dispose of any single Count of either Complaint, even partial Summary Judgement is not appropriate. Instead, this Court will treat this matter as in the nature of a Pretrial Order and limit the issues to be tried in accordance with the conclusions reached above. *See: Commonwealth Insurance Co. of New York v. O. Henry Tent & Awning Co.,* 266 F.2d 200, 201–202 (7th Cir.1959).

## II. CMW NEVER ADOPTED THE TARIFFS ON WHICH IT NOW RELIES

■ Mobil raises the claim that prior to its bankruptcy, CMW submitted an improper "adoption notice" to the Interstate Commerce Commission purporting to adopt tariffs of CMW's predecessor, the ICG. Mobil alleges that the terms of the adoption notice were deficient and consequently, CMW's adoption notice did not apply to intrastate transportation. Mobil maintains that CMW's adoption notice only included tariff rates for interstate carrier service. All of the undercharges at issue in this case are based on intrastate carrier movements. Thus, Mobil claims that "[t]he CMW tariffs were, therefore, inapplicable to the intrastate switch movements at the Mobil plant in Jacksonville, even if those switches are construed to be intraterminal, rather than intraplant as Mobil contends." Further, Mobil maintains that the net effect of the tariff deficiency in the CMW adoption notice is that CMW did not have an effective tariff, therefore, CMW had no valid rates for intrastate movements from April 28, 1987 to December 31, 1987. The Trustee alleges that CMW's adoption notice *was* applicable to intrastate movements as well as interstate rail moves during this prepetition period. The Trustee claims that the CMW "filed with the ICC, published, and kept open for public inspection Freight Tariff No. CMNW 9000 (the "Adoption Notice"). This Adoption Notice allegedly became effective April 28, 1987, and it stipulated that "it adopted, ratified, and made its own, in every respect as if the same had been originally and posted by it, all freight tariffs ... including supplements or amendments." By this adoption notice, the

CMW adopted Freight Tariff ICG 8000–E. According to the Trustee, this tariff included intrastate carrier movements.

Mobil states that "[b]y its terms, ... the adoption notice did not adopt any tariffs applicable to intrastate transportation." However, Mobil does not provide the Court with any substantive information that would assist the Court in determining whether the adoption notice did or did not apply to intrastate carrier movements. The basic issue here is the construction of the tariff and how it is to be interpreted. "In construing a tariff, the court must, so far as possible, give effect to all of its parts." *Great Northern Railway Company v. Commodity Credit Corporation*, 164 F.Supp. 442, 443 (D.C.Minn.1958). Here, the Defendant cites not one tariff provision which would support its allegation that intrastate movements were not adopted by the CMW. In fact, Mobil references Tariff 8000–A while the Trustee indicates that this tariff is 8000–E. Summary Judgement cannot be used to dispose of issues involving the construction of an applicable tariff when there is nothing specifically before the Court with which to determine applicability. *Id.* at 442. Therefore, the Court must deny Judgement on the issue of the validity of CMW's Adoption Notice, its relevance to intrastate carrier movements, or the applicability of the Trustee's prepetition undercharge claims.

## III. RAIL MOVEMENTS AND CHARGES BY THE TRUSTEE NOT APPLICABLE TO CMNW CONTRACT ICC–CMNW–C–0445

■ Mobil contends that CMNW Contract ICC–CMNW–C–0445 does not apply to the rail movements in Trustee's Complaint. Defendant maintains that the "contract on its face" applied to only cover those rail cars which: "(i) had previously been delivered and placed for unloading at Jacksonville, (ii) were then found not to be needed and, therefore, (iii) were required to be *reshipped* to Springfield to make room for other cars. These cars were later reshipped to Jacksonville." The Trustee claims that the Contract in question specifically addresses "all transportation" between Springfield and Jacksonville. Trustee maintains that the express terms of the contract "covers *any* move of synthetic plastic from Jacksonville to Springfield, or vice versa, with no express or even implied provision that only cars already delivered to Jacksonville are subject to the contract." Therefore, the Trustee's claims that arise under this Contract include all CMW rail moves between these two locations after May 1, 1989.

The interpretation of the Contract as it relates to the relevant CMW rail movements affects the amount of the undercharges claimed by the Trustee. Mobil has pointed to no relevant contractual language to corroborate its claim that the contract stipulated only certain origination and destination points. Although the Defendant offers affidavit testimony as to what Mobil's intentions were regarding the contract, the testimony does not prove that Mobil's interpretation of the Contract is valid. Mobil bears the burden of establishing that the Contract means what the Defendant says it means. Mobil has not sufficiently met this burden. *Hart*, at 822; *Korf v. Ball State University*, 726 F.2d 1222, 1226 (7th Cir.1984).

Mobil requests that the Court grant summary judgement on the issue of CMW rail movements as provided in the Contract in question. Although the Trustee maintains that the Contract is unambiguous, the parties dispute its intent. In determining whether a contract can be interpreted in more than one way, a court must examine the contract as a whole. *Metalex Corp. v. Uniden Corp. of America*, 863 F.2d 1331, 1334 (7th Cir.1988); *United Equitable Ins. Co. v. Reinsurance Co. of America*, 157 Ill.App.3d 724, 109 Ill.Dec. 846, 890, 510 N.E.2d 914, 918 (1st Dist.), appeal dismissed, 117 Ill.2d 554, 115 Ill.Dec. 410, 517 N.E.2d 1096 (1987). Therefore, summary judgement is inappropriate where issues of material fact exist regarding the language or meaning of a contract and the intention of the parties.

## REFERRAL OF ISSUES TO THE INTERSTATE COMMERCE COMMISSION

■ Mobil requests that if the Court denies Defendant's Motion for Summary

Judgement on Trustee's Complaint claiming prepetition undercharges, demurrage charges and charges pursuant to the contract, ICC–CMNW–C–0445, that it refer the entire matter to the Interstate Commerce Commission and stay the proceedings until the ICC's resolution. Mobil bases its request for referral on the Doctrine of Primary Jurisdiction. The Doctrine of Primary Jurisdiction requires that:

> the judicial process be suspended pending referral of certain issues to an administrative body for its views. No fixed formula exists ... Each case must be examined on its own facts to determine 'if the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by application in the particular litigation.'

*In re Taynton Freight Systems, Inc.,* 76 B.R. 971 (Bankr.M.D.Pa.1987) (*citing Farley Transportation Company, Inc. v. Santa Fe Trail Transportation Company, Inc.,* 778 F.2d 1365, 1370 (9th Cir.1985); *United States v. Western Pacific,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

Courts have not summarily referred issues of rate applicability and reasonableness to the Interstate Commerce Commission. Typically Courts have looked to the circumstances and tariff or rate technicalities of each case and decided accordingly. "Whether an issue of applicability should be referred depends on whether it involves questions of transportation policy and facts not within the conventional wisdom of the court, but instead requires the exercise of discretion and expertise by the ICC." *Lifschultz Fast Freight, Inc., v. A. Kush & Associates, LTD.,* 1991 WL 134192 (N.D.Ill. 1991). Further, "a bald assertion that the rate is not reasonable is an insufficient basis for staying a case pending referral to the ICC." *Id.*

█ Mobil claims the affirmative defense of rate unreasonableness as the justification for referral of this matter to the ICC. Mobil notes that even if the contract undercharges and demurrage charges as-

sessed by the Trustee "are found to be applicable, there is ample reason to believe that such charges would be found by the ICC to be unreasonable." The question of rate reasonableness does not become an issue unless the party claiming that a carrier's charges are unreasonable can prove that the carrier was market dominant at the time the transportation services were provided. Market dominance has been defined at 49 U.S.C. § 10709 as an "absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." [6] Even before the ICC can intercede in ratemaking practices, "it must make an initial, jurisdictional determination that the carrier has market dominance." *Western Coal Traffic League v. United States,* 719 F.2d 772, 776 (5th Cir.1983). Although Mobil provides testimony which suggests that the CMW may have been market dominant, Mobil has not established why it was not possible for the Company to resort to another carrier. Mobil notes that there are "no other rail carriers capable of delivering freight cars to Mobil's facility at Jacksonville. But the Defendant has not shown why no other rail carriers could not accommodate its shipping needs or why the use of CMW's transportation services precluded the use of other rail carriers. Even though Defendant claims that other modes of transportation for shipments are impractical or economically unrealistic, Mobil simply has not satisfied the Court that other rail carriers were not viable alternatives. Further, even the ICC found as early as 1971, that "there are few significant commodities which are not practically susceptible to transportation by at least two competing modes of surface transportation." *Western Coal* at 775, *citing: Illinois Central Gulf Railroad–Acquisition G., M & O, et al.,* 338 I.C.C. 805, 836 (1971).

Mobil has not convinced the Court that its unreasonableness claims would not be moot once additional facts are provided by both parties. Therefore, a wholesale refer-

---

**6.** Ex Parte No. 320 (Sub–No. 2), *Market Dominance Determinations,* 365 ICC 118, 120–27

(1981). See also: 49 U.S.C. § 10701a(b)(1) (Supp. IV 1980).

ral of these issues to the ICC is not warranted.

**CONCLUSION**

The Court denies Mobil's request for Summary Judgement. However, the issues to be addressed at trial are limited by the conclusions reached in this opinion. A referral of these matters to the Interstate Commerce Commission is premature at this time.